# Greenville Dairy Company, Inc., v. Pennsylvania Milk Control Commission

*Warren R. Keck,* for appellant.

*John J. Snyder* and *John V. Wherry,* for Pennsylvania Milk Control Commission.

ROWLEY, P. J., May 31, 1949.—This matter is before the court upon an appeal by Greenville Dairy Company from an order of the Milk Control Commission, dated June 8, 1948, which suspends plaintiff milk dealer's license for a period of 15 days. Such

appeals are governed by the Milk Control Law of April 28, 1937, P. L. 417, art. IX, PS §§700-j, 902, 906.

Section 700-j, 902, provides:

"Any person aggrieved by an order of the Commission in which the Commission refuses to issue, reissue, or transfer, or revokes or suspends, a license to operate as a milk dealer, or by any other order of the Commission applying only to a particular person or persons named therein and not otherwise specifically provided for, may, within twenty (20) days after the service of such order, file an appeal therefrom in the court of common pleas of the county in which he resides or has his principal place of business . . ."

Section 700-j, 903, authorizes the court to permit the appeal to act as a supersedeas, as was done in the instant case.

Section 700-j, 906, provides, inter alia:

"Mere technical irregularities in the procedure of the Commission shall not be the basis of the decision of the Court. In an appeal from an order or decision of the Commission applying only to the particular person or persons named therein, the case shall be heard upon the record certified to the Court by the Commission. Additional testimony shall not be taken before the Court, but the Court may, in proper cases, remit the record to the Commission for the taking of further testimony.

.    .    .    .    .    .    .    .    .

"Upon any appeal the Court shall determine whether or not the order appealed from is reasonable and in conformity with law. The appellant shall have the burden of proving that an order of the Commission is unreasonable or illegal. If the Court shall determine that the order is unreasonable or illegal, it shall remit the case to the Commission with directions to reform the findings or order, or to revoke the order, in accordance with the Court's opinion."

For convenience, we shall hereinafter refer to Greenville Dairy Company, plaintiff, as dairy company, and to Milk Control Commission, defendant, as commission.

The dairy company, an authorized milk dealer, has its principal place of business in Greenville, Mercer County, Pa. It vends milk in the counties of Crawford, Mercer and Lawrence.

On May 6, 1948, the commission caused to be served upon the dairy company a citation to appear in the Court House, New Castle, Pa., on May 17, 1948, to. show cause "why the said Milk Control Commission should not revoke or suspend milk dealer's license No. 1803 granted to the above named milk dealer for the year May 1, 1948 to April 30, 1949, inclusive, and should not suspend or revoke the right of the above named milk dealer to apply for a license for the year May 1, 1949 to April 30, 1950, inclusive."

The citation continues:

"You are particularly cited for, and this hearing will concern itself with, the following alleged violations of the Milk Control Law of April 28, 1937, P. L. 417, as amended by the Act of July 24, 1941, P. L. 443, and the rules, regulations and orders of the Milk Control Commission issued pursuant thereto:

Failure of the said defendant milk dealer to sell milk at wholesale at the rates prescribed by the Orders of the Commission; and the action of the defendant milk dealer in selling and/or offering to sell milk at wholesale at rates that are less than the rates prescribed by the Orders of the Commission; and the failure of said defendant to comply with the provisions of section 807 of the Milk Control Law, Act of April 28, 1937, P. L. 417, as amended by the Act of July 24, 1941, P. L. 443, and the rules, regulations and provisions of the Milk Control Commission relative to the sale of milk at wholesale; in that after the said Milk Control Commission had fixed a minimum whole-

sale price to be charged for milk in milk marketing area No. 2 by its Official General Order No. A-247, the said milk dealer, during the period April 1, 1948 to and including April 30, 1948, by use of the device or devices of discount, premium, rebate and/or free service, sold and/or offered to sell milk at a price less than the minimum price applicable to the particular transaction."

On the date of the hearing, counsel for the dairy company moved for a continuance of the hearing and an order upon the commission to furnish a bill of particulars "setting forth specifically the offenses alleged to have been committed by defendant so we may have the opportunity of preparing our defense". The chairman refused the motion, stating: "I think he has had sufficient notice, and the charges are plainly in the citation."

The brief filed with us by the commission declares that if the dairy company "had any doubt in his mind as to the charges against him he had eight days to request the Milk Control Commission for further information as to the charges".

This declaration ignores the plain provision of the statute that the licensee be furnished "a statement of the matters complained of".

To the brief of the commission is attached a so-called stipulation which it states was furnished to the dairy company, before the hearing, by the commissioner who argued the appeal.

At the oral argument, counsel for the dairy company stated that at a meeting with the commissioner in Harrisburg, the latter submitted the stipulation for signature by licensee and that upon licensee's refusal to sign, the commissioner seized the papers saying: "I'll be d—— if I show you what we have on you," or substantially that.

The commissioner, though present as counsel at the argument, entered no disclaimer.

It is not strange that the licensee declined to accept the stipulation as the facts to be considered by the commission, since the stipulation wholly ignored material facts shown by the commission's own evidence adduced at the subsequent hearing.

The brief of the commission argues that the citation put the licensee on inquiry and therefore amounts to "notice". The commission cites Pennsylvania Range Boiler Co. v. City of Philadelphia, 344 Pa. 34, First National Bank of Biddeford v. Pittsburgh F. W. C. Ry. Co., 31 F. Supp. 381, and In re Leader Furniture Co., 36 F. Supp. 986, to support this contention. In the Range Boiler case the question was:

"whether a subsequent innocent purchaser of real estate is chargeable with notice of the award of damages and the payment thereof to his predecessor in title to cover future losses which may result from a change of grade of a street, when the only record is contained in the notes of testimony in a proceeding before a Board of View concerning another street."

The court answered in the negative and quoted from Tabor Street (No. 1), 26 Pa. Superior Ct. 167, 173, as follows:

" 'Whatever puts a party upon inquiry amounts in judgment of law to notice, provided the inquiry becomes a duty, as in the case of purchasers and creditors, and would lead to the knowledge of the requisite fact by the exercise of ordinary diligence and understanding.' "

This rule, declared more than a century ago, is not disputed. The question is as to the application of the rule to the particular case. It has been commonly applied in cases concerning unrecorded deeds to land, and in cases of purchasers and creditors.

In the Tabor case complainant had accepted his deed after the recording of a prior conveyance.

In the First National Bank case, supra, the bank had permitted a transfer of stock in breach of a trust. The bank answered that it had no notice of decedent's death. Prior to the transfer the bank had received a certificate showing probate of decedent's will.

In the Leader Furniture case, supra, the bank had knowledge that the merchandise was sold on bailment leases. The bank took an assignment of the accounts without obtaining the leases. The bank had examined assignor's records which noted that assignment had been made.

Nothing in the cases cited has any application to the question here involved.

Practically all of the argument of the commission addressed to its statement of the second question involved, is predicated upon the assumption that the licensee had received a copy of the stipulation. It now appears that that assumption was erroneous.

In the course of the hearing the commission produced nine witnesses. The assistant manager of the A. & P. Tea Company of New Castle, Lawrence County, testified that the dairy company on April 29, 1948, delivered to his store 100 half pints of chocolate milk as free samples, and that his store gave them away as free samples. The witness stated that the samples were given with a purchase of Greenville Dairy Company milk, but there is no evidence that the dairy company attached such condition to the distribution. Counsel for the commission enquired:

"Q. How did you know it was only to be given away with Greenville Dairy Milk?

"A. It was given to us by the Greenville Dairy Company to be given away."

Kozar, manager of an A. & P. Super Market in Farrell, Mercer County, testified that on April 29,

1948, he received free 10 one-half pints of chocolate milk which was distributed free to the purchasers of dairy company milk. The witness did not state that the dairy company attached any condition to the distribution of the free milk. He did not personally receive the delivery from the dairy company.

Porado, a grocer of Meadville, Crawford County, testified that on April 30th, he was given two quarts of chocolate milk, in a new type of container, as samples.

Levine, a grocer of Sharon, Mercer County, testified that on April 28th, he received some free half-pints of chocolate milk in a new type of container which he was to give away as samples to purchasers of a quart of white milk.

Betters, manager of a super market in New Castle, Lawrence County, testified that on or about April 3rd, he received free 12 quarts of milk, and 4 free quarts on the following day, to be distributed as free samples. by way of explanation, the witness added:

"We used to take milk from them and the customers wasn't completely satisfied. It was getting spoiled so quick. So they (customers) did not take any more and I quit handling it, and they (dairy company) came back and gave us some in the new container."

Mrs. Hassan, a grocer of New Castle, Lawrence County, testified that, early in April, the dairy company proposed to leave some free milk as samples, and that she accepted only one sample of chocolate milk and one sample of white milk.

Sheraff, a grocer of New Castle, Lawrence County, testified that in April on two occasions the dairy company delivered six quarts of milk of assorted types, free, to be used as samples.

Miss Stevens, a grocer of New Castle, Lawrence County, testified that, in April, she was given two cases of milk: "They gave me the milk and said to give it to the customers, to try with the paper bottles."

(Inasmuch as the charge is that milk was sold for less than the authorized rates, it may be noted that the majority of the witnesses were not customers of the dairy company when the free milk was delivered to them.)

At the conclusion of the testimony offered by the commission, counsel for the dairy company moved that the hearing be continued to permit it to prepare a defense to these charges, stating:

"We propose to prove that the giving of free milk and samples is a practice customary in the industry and also that it has been sanctioned by the commission. We feel since we were not given proper notice of the offenses charged against us that we are entitled to an opportunity to prove these allegations.

"We feel that we are entitled to an opportunity to prove that the giving of free milk and samples has been sanctioned by the commission and we can prove this, if given the opportunity."

The chairman overruled the motion, declaring,

"This citation was sent out as of May 6th. This is May 17th. I feel that the charges as set forth in the citation generally state what you are charged with and you have had ample time to prepare a defense. I don't feel we should continue this hearing and I ask you, Mr. Keck, to present your evidence at this time."

(It will be observed that the complaint of the dairy company was not as to the period intervening between the service of the notice and the hearing, but that the citation did not include a statement of the matters complained of.)

On June 8, 1948, the commission filed its findings of fact, including the following:

"6. That the defendant milk dealer, contrary to the Milk Control Law of April 28, 1937, P. L. 417, as amended by the Act of July 24, 1941, P. L. 443, and the

rules, regulations and provisions of the Milk Control Commission relative to the sale of milk at wholesale, gave free milk in the amounts, on the dates and to storekeepers as listed below, the price of milk being fixed at wholesale by Official General Order No. A-247 of the Milk Control Commission of the Commonwealth of Pennsylvania."

(This finding omits the material and undisputed fact that in every instance the free milk was delivered to the retailer for free redistribution as samples, and that it was so redistributed by the retailer.)

"7. That free milk given to the storekeepers by the Greenville Dairy Company, Inc. *contrary to law*, was pursuant to arrangement between Greenville Dairy Company, Inc., and various storekeepers whereby said milk would be given away free only to customers who made purchases of Greenville Dairy Company's milk." (Italics supplied.)

(Of the witnesses produced, Levine testified: "We gave them away with a quart of white milk. I don't know which type but I know it was given away with a quart of white milk. They were given to me with the understanding I was to give one away with the quarts of white milk." This witness, only, testified to any limitation upon the redistribution by the retailer. The testimony indicates that of the number of recipients of the free milk, approximately one half were not customers of the donor.)

"8. That the defendant milk dealer failed to sell milk wholesale at the rate prescribed by the order of the Commission and thereby failed to comply with provisions of Section 807 of the Milk Control Law, Act of April 28, 1937, P. L. 417, as amended by the Act of July 24, 1941, P. L. 443, and the rules, regulations and provisions of the Milk Control Commission relative to the sale of milk at wholesale."

We do not feel called upon to now determine whether the free distribution under the circumstances shown, constituted a sale.

In the discussion accompanying its findings the commission says,

"It will also be noted that the evidence on the record shows as much as two cases of free milk given to a single store. It is highly questionable whether it could be presumed that such large amounts, distributed without thought of recompense, could be considered merely for advertising purposes."

This milk was given to the proprietor of a grocery store in the city of New Castle. The recipient was not a customer of the dairy company. She purchased nothing in the transaction. The quantity was presumably 24 or 48 containers of unknown size. In her words: "They gave me the milk and said to give it to the customers, *to try with the paper bottles.*" It would be difficult to discover any sinister purpose in this transaction.

The commission declares: "However, whether the acts of the defendant were committed with the intention of cutting prices, or merely as a method of advertising, the result is the same."

We believe the foregoing declaration is subject to some qualification. If the act complained of is prohibited by law or by lawful order of the commission, then the purpose, however laudable, cannot excuse it. However, if the act in itself is not unlawful but becomes so only when it is a part of a scheme, or device, or method to evade the law or other lawful order, then the intention and purpose of the actor might become vitally material.

The discussion of the commission includes this declaration: "No free milk of any type whatsoever for any purpose whatsoever may be given away by a dealer."

No statute nor order of the commission so declared. If we assume the authority of the commission to make such an order, then as a matter of fairness to the dealers, the prohibition should have been entered in the regulations promulgated by the commission or otherwise brought to the attention of the dealers. No such regulation was adopted by the commission prior to the instant hearing.

Since the enactment of the Milk Control Law, more than 10 years ago, the distribution of some free samples of milk has not been an unknown practice. Indeed, at the oral argument, the commissioner conceded that the commission had previously, at least tacitly, approved the distribution of samples limited, as we recall his statement, to one unit per month per customer. However that may be, we think it may be said that free milk was distributed with the knowledge of the commission, and that the practice was not formally proscribed by it until after the entry of the order in the instant case.

If it had been shown that the licensee had given free milk to a retailer as part of a milk purchase, the retailer would have had the right to sell the free milk and thus reduce the cost of his purchase. Similarly, if the retailer were supplied with free milk to be given only with a purchase of the licensee's milk, the net result would be to reduce the price to the consumer. Both of these practices would offend the statute which declares unlawful any method or device whereby milk is sold or handled at a price less than the minimum applicable to the particular transaction. However, in order to determine whether the transaction was an unlawful "device" or "method", it was not sufficient to find merely that free milk had been distributed. The arrangement under which the milk was distributed to the dealer and by him dispensed would illuminate

the matter. Gift of a few samples to demonstrate a new type of container, gift of a new type of milk to a customer, or gift of samples to a prospective purchaser might fall far short of an unlawful method or device. The gift in itself could be only a part of the method. Obviously, a review of all material factors of the transaction would be necessary to a just judgment of its lawfulness.

We have been speaking of the prohibition contained in a statute. If the conduct of licensee was unlawful, it was only so because of the statute.

What we have said is not inconsistent with the power of the commission to prohibit distribution of free samples of milk for any purpose whatsoever, but, until the commission formally enters such prohibition, the declaration contained in its instant order, that "No free milk of any type whatsoever for any purpose whatsoever may be given away by a dealer" is of questionable validity.

We think it may be said that the practice of distributing free samples of milk, however honest in its inception, is likely to lead to price-cutting or other evasions which would defeat the purpose of the Milk Control Law.

On June 8, 1948, the commission entered an order suspending the license of the Greenville Dairy Company "to be effective June 21, 1948 and to continue in full force and effect until June 30, 1948, inclusive", a period of 10 days.

Notwithstanding that the statute permits one aggrieved by the order of the commission to appeal to the court of common pleas, as a matter of course, the order of the commission includes the following,

"2. That if this Order be appealed from and a supersedeas granted, should said appeal be dismissed or otherwise terminated favorable to the Commission, any

license issued for any period subsequent to April 30, 1949 shall be automatically suspended *five* days after the termination of the appeal for a period of *fifteen* (15) days." (Italics supplied.)

This provision might better have been omitted.

It will be observed that appellant is to be penalized by suspension for a longer period, and that suspension shall become effective in five days after approval of its order.

The order of suspension includes the following:

"1. Suspension is interpreted to mean:

"(*a*) That the defendant, Greenville Dairy Company, Inc., shall cease to do business as a milk dealer or handler anywhere in the Commonwealth of Pennsylvania, either directly, or indirectly as factor, broker or agent.

"(*b*) That the defendant, Greenville Dairy Company, Inc., shall cease to buy milk from producers or from other dealers.

"(*c*) That the defendant, Greenville Dairy Company, Inc., shall not engage or attempt to engage in the dairy business through an agent, broker, assignee, factor or vendee.

"(*d*) That the defendant, Greenville Dairy Company, Inc., shall not attempt to engage in the dairy business by any subterfuge, artifice or trick.

"(*e*) That no milk shall be received, purchased, bottled as agent, or in any way handled or brought into the plant of the said Greenville Dairy Company, Inc.

"(*f*) *That the defendant, Greenville Dairy Company, Inc., shall not order, direct or in any way permit any employees now employed, or other employees hired during the period of suspension of milk dealer's license No. 1803, to perform any function or any labor in connection with the dairy business of Greenville Dairy Company, Inc.* (Italics supplied.)

"(g) That any automobiles, trucks or delivery trucks, owned or controlled by the said Greenville Dairy Company, Inc., shall not be leased, rented or lent to any person or party for transportation for sale of milk or milk products for the period of this suspension."

The extent of the operations of the dairy company does not appear in the evidence but it does appear that it vends milk in the counties of Crawford, Mercer and Lawrence.

The order would undoubtedly devastate the business of the company, dissipating its producers and its purchasers—a consequence totally disproportionate to the offenses charged against it.

The terms of 1(f), supra, are sweeping enough to prevent the company from safeguarding its plant or protecting its machinery and equipment, or preserving other property contained in its plant.

Even the bitterness engendered in an industrial dispute commonly relaxes sufficiently to permit free access by maintenance men to a struck plant.

It is not at all certain that the omission of the company to conserve the safety of its plant might not jeopardize the safety of persons or other property in the vicinity.

If it be said that the company is permitted five days to prepare for a complete paralysis, the answer is that such period would be grossly inadequate. But we are even more concerned for the producers who have been supplying the dairy company, and we may assume there are a large number. It is doubtful that these producers could, within five days, find a satisfactory temporary market for the period of suspension. It cannot be supposed that the consumers, of whom we assume there are many, would not be seriously affected by the temporary loss of their accustomed supply of milk. Producers and consumers could more readily adjust to a long period of suspension or to a complete

revocation of the dealer's license. The chaotic consequences of the instant order would be far-reaching, affecting vitally other milk dealers in the community as well as many other businesses.

It has been repeatedly declared that the purpose of the Milk Control Law and the duty of the Milk Control Commission is "to assure the citizens of this Commonwealth an adequate supply of pure and wholesome milk at all times".

If the existing order of the commission were approved by us, in five days producers and consumers would face dire disorder and confusion, in direct conflict with the purposes of the Milk Control Law.

The third question stated in the brief of the commission is whether the giving of free samples constitutes a violation of the Milk Control Act. The question will be simplified if we bear in mind that no one now challenges the power of the legislature to enact that statute, nor does any one here question the wisdom of the enactment, nor is it denied that the commission has broad powers to supervise and regulate the milk industry.

Prior to the instant complaint, the commission had made no order prohibiting the distribution of free samples of milk, therefore the acts were only unlawful if they were within the terms of the statute which made it unlawful to employ a method or device whereby milk is sold or handled at rates under the approved price.

In determining whether certain acts constitute a scheme or device within the terms of a prohibitory statute, the commission has no peculiar ability for the undertaking. No question of policy or discretion is involved. The legislature has declared that certain conduct is unlawful. In acting upon the matter the duty of the commission is to apply the terms of the statute to the facts shown by the evidence. If in this

application it appears that some of the elements of the offense are missing for lack of evidence, the commission may not, by virtue of its broad powers, fill in the missing elements because it believes that the conduct should be proscribed on general principles. However, this does not mean that the commission may not prohibit an otherwise lawful single act although the legislature prohibits the particular act only if it is a part of a device for an ulterior purpose. A court or jury with no special knowledge of the milk industry could readily determine whether the act is within the prohibition of the statute.

In considering the validity of a regulation of the commission, much must be conceded to the special knowledge and discretion of the commission and to the broad authority conferred upon it by the legislature. Where, however, the commission sits as a judge and jury to decide whether certain acts are within those prohibited by a certain statute, their authority is as limited as the authority of a court of law. No question of policy is involved.

We deem it unnecessary to discuss the authorities cited by the commission upon interpretation of statutes.

There is not presented here a question as to the extent of the authority granted to the commission nor of the power of the legislature to grant the authority.

If it is meant to be argued that since the commission is authorized to regulate and control the milk industry, it may summarily penalize a licensee for an act lawful in itself without any previous prohibition, we emphatically disagree. If the commission should prohibit the sale of milk in half-pint containers the regulation would be prima facie invalid. However, if the experience of the commission developed that the use of such containers offered a ready way of evasion of the law or hindered necessary supervision of distribution, such

an order might be sustainable not merely because the commission had declared a prohibition but because the attendant evils reasonably justified regulation. However, in such a situation, all would agree that no penal action for the use of such containers could be maintained without a prior formal order of prohibition. Certainly, it will not be supposed that in granting to the commission the power to control the milk industry, the legislature intended to impose no limitations except the commission's own self-restraint.

The instant complaint is not that the commission lacked authority to prohibit distribution of samples, but that it undertakes to penalize licensee for an act not theretofore forbidden, and not unlawful per se. The commission is without power to add to the terms of a statute words which the commission thinks the legislature should have included therein, nor is there need for such power inasmuch as the commission itself has the authority to prescribe needful regulations.

In Pennsylvania Milk Control Com. v. Nicoson, 57 D. & C. 166, Judge Creps points out that the broad authority invested in the commission constitutes:

"a concentration in one agency of government of the combined powers that normally are possessed by three separate and distinct branches of government, legislative, executive and judicial. The commission form of government is so fraught with potential dangers to the rights and liberties of its subjects, through capricious or oppressive action, that it is not surprising that the question of the illegality or unreasonableness of its orders should be made the subject of inquiry by the judiciary."

The efficiency of law depends in no small degree upon the respect of the people. Citizens have long been accustomed to view a court and jury as the appropriate tribunal to measure the limits of their rights. Where,

as here, the exigencies warrant the legislature in providing for a more summary disposition of a matter, the agency which is thus fortified with broad and unusual authority must have a care to observe those essential principles which laymen have long associated with the term "due process of law".

The statute declares unlawful any method or device, by discount, premium, rebate, free service, trading stamps, advertising allowance or extension of credit, etc., by means of which milk is sold or handled at a price less than the minimum applicable to the particular transaction.

The same statute provides for summary conviction for violation of any section of the act, with a penalty of a fine of not less than $25 nor more than $300, with imprisonment for default of payment.

The statute also provides, sec. 1002:

"For a third or subsequent offense, any person violating any provision of this act, . . . shall be guilty of a misdemeanor and shall, upon conviction thereof, be sentenced to pay a fine of not less than five hundred dollars ($500.00) nor more than one thousand ($1,000.00) dollars, or to undergo imprisonment not exceeding one (1) year, or both."

These penal provisions of the statute indicate something of the legislature's estimate of the grievousness of the offense charged in the instant case. While it is essential that the commission have power to suspend and revoke licenses in order to obtain compliance with its orders, a more confidence-inspiring procedure might result if prosecution of offenses of the character here involved were entrusted to those tribunals commonly designated by law for the purpose, the commission reserving for punishment by suspension or revocation only those cases where the violation is of a grave nature or where the violation is persistent.

The brief of the commission recites that the commission has previously warned "the officers of this corporation to cease and desist in the practice of giving away milk". There is no evidence of this fact and it was highly improper for the commission to consider, as seemingly it did, a matter not appearing in the record.

" 'In such cases the Commissioners cannot act upon their own information as could jurors in primitive days. All parties must be fully apprised of the evidence submitted or to be considered, and must be given opportunity to cross-examine witnesses, to inspect documents and to offer evidence in explanation or rebuttal. . . . In no other way can it test the sufficiency of the facts to support the finding; for otherwise even though it appeared that the order was without evidence, the manifest deficiency could always be explained on the theory that the Commission had before it extraneous, unknown but presumptively sufficient information to support the finding: United States v. Baltimore & Ohio S. W. R. R., 226 U. S. 14'; Int. Com. Comm. v. Louisville & Nashville R. R., 227 U. S. 88, 93. The avowed purpose of the commissioner in receiving the evidence and its reference to the engineering department for report to the Commission, make it impossible for us to consider the order reasonable and in conformity with law for the reasons indicated": Phila. Rapid T. Co. v. Public Service Commission, 78 Pa. Superior Ct. 593.

"The matter referred to did not form a part of the rule, was not in evidence as part of the testimony and, therefore, was not properly before the Commission and will not support in whole or in part its order in this case": Shenendoah Suburban Bus Lines Inc. Case, 158 Pa. Superior Ct. 638.

By Bulletin No. 277, issued by the commission on January 12, 1949, the distribution of free milk was prohibited. The bulletin contains the following: "the Commission will be forced to make arrests without further notice whenever proof of this violation is established".

It now appears from the evidence that the commission was charging that the dairy company distributed free milk. It would have been so simple to state just that in its citation. We do not now undertake to decide whether the citation as drawn sufficiently complied with the statutory requirement that the citation include "a statement of the matters complained of".

When the dairy company requested the commissioner to order a bill of particulars, any doubt as to its right thereto should have been resolved in favor of the licensee, particularly where the commission was embarking upon a proceeding which contemplated seriously crippling licensee's business in event of conviction.

When counsel for the dairy company requested a continuance of the hearing and declared "We still feel we have not been given proper notice and we feel that we are entitled to an opportunity to prove that the giving of free milk and (as) samples has been sanctioned by the Commission and we can prove this, if given the opportunity," the commissioner would have done well to have granted the continuance. That the commission did not regard the case as requiring great haste in disposition, is evidenced by the fact that the commission did not argue the appeal until 10 months after the court's order permitting a supersedeas. Courts owe the fullest support to administration of the Milk Control Law, a law which has as its purpose the protection of the health, welfare and comfort of the people. The statute specifically declares that the court shall not disturb the action of the commission for mere tech-

nical irregularities in the procedure of the commission. It must be remembered, nevertheless, that the legislature does not have the power to contravene the constitutional rights of the citizen, however laudable the purpose of the legislation.

"The requisites of due process are as necessary in administrative as in judicial proceedings": Commonwealth ex rel. Chidsey v. Mallen et al., 360 Pa. 606.

In Philadelphia College of Law, Inc., v. Morrison, 51 D. & C. 349, the Secretary of the Commonwealth undertook to revoke plaintiff's certificate of authority. The college applied for a writ of mandamus, averring that it "is entitled to a pleading containing factual averments of the alleged violations with definite specifications therein and an opportunity to reply and to be heard by its witnesses and counsel according to the principles of due process of law"; that "Said complaint and notice of complaint are utterly vague, uncertain and indefinite, and they contain no factual averments whatever upon which such action for revocation can be predicated by complaint, or definitely answered with exactitude by the respondent," and that "Said alleged complaint and notice of complaint contain merely erroneous and unsupported conclusions of law."

The matters there presented were not dissimilar to the points involved in the instant case.

Judge Hargest, in discussing whether the order of revocation was based upon a proceeding which afforded due process of law, declared:

"In Armour Transportation Company v. P. U. C. 138 Pa. Superior Ct. 243, 249, it is said: 'The requirement of due process of law in procedural matters applies to proceedings before administrative tribunals as well as before judicial bodies. It is a well-recognized principle in our law that no man's property rights shall be impaired or penalties imposed without notice and an opportunity to appear and be heard: Nat'l Automo-

bile Service Corp. v. Barfod, 289 Pa. 307, 137 A. 601. Our present chief justice in that case stated (pages 311-312) : "The requirement of due process of law, however, applies to administrative as well as to judicial proceedings. The doctrine of notice and hearing thus becomes a more potent force in our land because it applies to the decisions and acts of administrative officials and, unless there are extraordinary emergencies, this essential requisite of due process cannot be dispensed with . . .".' "

It will be noted that in the instant case, as in the College case, supra, the complaint was not that no notice had been given, but that the notice given did not specify the facts which constituted the alleged violation.

We quote further from the opinion of Judge Hargest:

" 'Chief Justice Hughes . . . stated, in Railroad Commission v. Pacific Gas & Electric Co., 302 U. S. 388, 393, 58 S. Ct. 334, 82 L. Ed. 319: "The right to a fair and open hearing is one of the rudiments of fair play assured to every litigant by the Federal Constitution as a minimal requirement: . . . There must be due notice and an opportunity to be heard, the procedure must be consistent with the essential of a fair trial, and the Commission must act upon evidence and not arbitrarily." Justice Cardozo, in the Ohio Bell Telephone Company case, discussing the necessity of an open and fair hearing, said (p. 305) : *There can be no compromise on the footing of convenience or expediency, or because of a natural desire to be rid of harassing delay, when that minimal requirement has been neglected or ignored.*" (Italics by Judge Hargest.)

" 'Our President Judge, in Nelson v. Garland et al., 123 Pa. Superior Ct. 257, 266, 187 A. 316, stated (with reference to the due process clause of the Federal Constitution) : "The corresponding provision of our own

constitution (Art. I §9) warrants the ruling that wherever liability is sought to be imposed on a person or corporation . . . as a result of a hearing before some court, magistrate, board or tribunal, it is a necessary prerequisite to such liability that the party, if within the jurisdiction, shall have notice of and opportunity to appear and be heard at such hearing." ' "

Judge Hargest also quotes from National Automobile Corp. v. Barfod:

"The decision of administrative bodies, when the police power in certain phases of administrative acts is under consideration, may be of a quasi judicial nature, as when law is applied to the facts. In all such cases, notice and hearing are imperative.

" 'The Constitution guarantees to those who invest their property in business enterprises that it will not be taken without due process of law.' "

(We again point out that the complaint in the College case was not want of notice but lack of specific allegations.)

The opinion of Judge Hargest refers to the opinion of the Dauphin County Court of Common Pleas in Nevins Drug Co. v. State Board of Pharmacy, 49 Dauph. 145, where it was said:

" 'The literature of the law is now replete with cases to show that such conduct on the part of administrative boards cannot be sustained, and that such boards cannot lawfully exercise unlimited discretion where the legislature has prescribed no limits within which to confine such discretion. And the power of administrative tribunals under such a statute *cannot be sustained upon the theory that it must be assumed that they would act* for the public good.' " (Italics supplied.)

The opinion of Judge Hargest declares:

"An examination of the conduct of the Secretary of the Commonwealth in the instant case shows that there was an utter lack of due process of law.

.     .     .     .     .     .     .  .     .     .

"This record not only shows no adequate finding, but it shows no reasonable notice, *no definite complaint as to what petitioner should meet,* and no adequate hearing. (Italics supplied.)

.     .     .     .     .     .     .     .     .

"The Secretary of the Commonwealth notified the college that upon that complaint the conferring of degrees of various kinds constitutes a violation of law, without indicating when, where, how, or what degrees it is alleged the college conferred.

.     .     .     .     .     .     .     .     .

"Thereupon counsel took an exception again, for the reason stated in the demurrer which he filed, and that his client was 'entitled to a pleading containing factual averments of the alleged violations with definite specifications therein and an opportunity to reply and to be heard by its witnesses and counsel according to the principles of due process of law.' "

The opinion of Judge Hargest concludes:

"It is hardly necessary to comment upon this proceeding. At no step were the processes of law afforded to petitioner. No specific charges of violation were given and no semblance of an adequate hearing afforded."

Regardless of the classification in which we place the producer and dealer in milk, and admitting that in the exercise of the police power the business is subject to certain regulations, it does not follow that there are no limitations upon the remedy which may be applied. In fact, the remedy must bear a reasonable relation and be appropriate to the object to be accomplished. It must not be discriminatory or arbitrary. It must appear that the means employed are reasonably neces-

sary for the accomplishment of the purpose, and not unduly oppressive.

In DeLucca's Liquor License Case, 124 Pa. Superior Ct. 500, it was said:

" '. . . due notice' means, at least, that the licensee must be informed that he has been charged with specific violations of the liquor laws, or of the regulations of the Pennsylvania Liquor Control Board."

In Armour Transportation Co. v. Pennsylvania Public Utility Commission, 138 Pa. Superior Ct. 243, the commission on July 1, 1936, refused to renew carrier's certificate. The carrier appealed. The commission requested return of the record; apparently the particular matter was not proceeded with. On February 8, 1938, the commission upon its own motion instituted an investigation to determine whether the carrier had violated the provisions of the Public Utility Law. (It does not appear whether this investigation was undertaken because of information obtained by the commission upon the hearing of the application for renewal of the carrier's certificate.) Notice was served upon the carrier that the Commission was undertaking an investigation to determine whether the carrier "has violated the provisions of the Public Utility Law", and that a hearing would be held on March 25, 1938. The commission held two hearings. The carrier was given an opportunity to present testimony two weeks from the date of the last hearing. It refused to do so, "alleging then, as all the way through this proceeding, that the order was unlawful because no written complaint had been filed setting forth any specific violations by it of the Public Utility Law".

The Superior Court declared:

". . . the order appealed from was void (1) because it was not made in conformity with the statute, and (2) because the failure to inform appellant of the nature of the violations charged, *by the filing of a*

*reasonably specific written complaint* constituted a denial of procedural due process in violation of state and federal constitutional provisions." (Italics supplied.)

The Superior Court made this pertinent observation:

"The very object of the complaint, of course, is to inform definitely the one against whom it is made of the nature of the charges. That is only fair."

The court continued:

"We could end our discussion at this point, as we think the proper interpretation of the statute referred to justified the appellant in demanding that a specific written complaint be filed against him.

"2. If our construction of the statute is incorrect, there would arise the question whether the appellant has been deprived of the constitutional right of due process."

The Superior Court reiterated:

"The requirement of due process of law in procedural matters applies to proceedings before administrative tribunals as well as before judicial bodies. It is a well-recognized principle in our law that no man's property rights shall be impaired or penalties imposed without notice and an opportunity to appear and be heard: Nat'l. Automobile Service Corp. v. Barfod."

The Superior Court quotes the following from the Barfod case:

" 'The doctrine of notice and hearing thus becomes a more potent force in our land because it applies to the decisions and acts of administrative officials and, unless there are extraordinary emergencies, this essential requisite of due process cannot be dispensed with. . . . The courts must always be free to determine on their independent judgment whether the specific act infringes the constitutional limitation; and where substantial property rights are impaired, it must be predicated on notice and opportunity to be heard.' "

The Superior Court further noted:

"The present proceeding before the Commission, involving the forfeiture of appellant's franchise and the imposition of a fine, based upon its alleged violations of law, bears an analogy to criminal charges against an individual, in which proceeding the right to be informed of the nature of the charge is fundamental."

The Superior Court adopts the declaration, supra, of Chief Justice Hughes that the right to a fair and open hearing is one of the "rudiments of fair play".

The Superior Court concluded:

"The question of what is proper notice, or, as here, of what constitutes *a specific designation of the issue raised or charges made*, depends necessarily upon the facts of each case, the type of the investigation being conducted, the violations alleged, and the penalty or order sought to be imposed. Where the purpose of the investigation by the Commission is only to determine the reasonableness of rates charged by a utility, a different standard would seem to apply then where the franchise of the utility is sought to be revoked for violation of the utility laws and a penalty or fine imposed."

In Morgan et al. v. United States, 304 U. S. 1, Chief Justice Hughes declared:

"Those who are brought into *contest with the Government* in a quasi judicial proceeding aimed at the control of their activities are entitled to be fairly advised of what the Government proposes and to be heard upon its proposals before it issues its final command.

.    .    .    .    .    .    .    .    .

"Congress, in requiring a 'full hearing', had regard to judicial standards,—not in any technical sense but with respect to those fundamental requirements of

fairness which are of the essence of due process in a proceeding of a judicial nature.

. . . . . . . . .

"The requirements of fairness are not exhausted in the taking or consideration of evidence but extend to the concluding parts of the procedure as well as to the beginning and intermediate steps."

There is no reason why a merchant should not make an absolute gift of his merchandise to his customers if he desires to be benevolent or thereby to advertise his business: Commonwealth v. Zasloff, 338 Pa. 457. It is only when the object is sinister that a gift of merchandise is an economic or social evil. Of course, the law is not so inane that a vendor may evade its prohibition of a sale by merely calling the transaction a "gift". The law will penetrate any guise and apply the true designation to the act or conduct. By the same token, the commission cannot by merely calling a gift a "sale", bring the gift within a statute prohibiting a sale. However, this is not inconsistent with the authority to prohibit a gift as such.

The legislature declared it unlawful by any device or method to sell or handle milk below the approved price. The dairy company does not here challenge the power of the commission to prohibit the distribution of free milk. If it be conceded that the commission may by its order convert a normally lawful gift into a penal offense, the pronouncement must be in unmistakable terms, duly promulgated, to enable a licensee to ascertain precisely what acts the commission intends to forbid and therefore what conduct on his part will render him liable to penalty.

It seems to be conceded that the commission did on January 12, 1949, formally prohibit "the practice of furnishing free samples of fluid milk and other dairy products as an advertising medium".

The instant order against appellant had been entered June 8, 1948, antedating the prohibition by some seven months.

In Commonwealth v. Cronin, 336 Pa. 469, 474, the Supreme Court said:

"While (the procedure followed) may be permissible by law, especially in view of the right of the licensee to appeal to the court of common pleas, it does not, in our opinion, conform to the rudimentary requirements of fair play, and afford an open and impartial hearing. If the licensees are given full opportunity to present their defense before the hearing inspectors, and to cross-examine their accusers asserting charges against them, many unnecessary appeals to the Court from the action of the Secretary will be avoided."

In our discussion, we have considered the following matters: Failure of the instant citation to state specific facts, refusal of the commission to grant a bill of particulars, refusal of the commission to allow a continuance to afford the licensee an opportunity to prove that the commission had theretofore sanctioned the free distribution of milk as samples, failure of the commission to include in its findings of fact material matters which were an integral part of the transaction which the commission charged was an unlawful "device" or "method", the commission's unsupported finding that the free distribution was in pursuance of an arrangement whereby the milk was given free only to purchasers of dairy company's milk, the consideration by the commission of the unsupported claim of previous warning to licensee, and the added penalty imposed for appeal. If, notwithstanding these matters, we could still find within the instant record, "the rudiments of fair play", which Justice Hughes declares "is assured to every litigant by the Federal Constitution", supra, there would nevertheless remain the harsh terms of

the suspension order, which, for the reasons hereinbefore discussed, we regard as altogether unreasonable under the circumstances of the instant case.

### Order

And now, May 31, 1949, this matter came on for argument upon an appeal from an order of the Milk Control Commission suspending the license of the Greenville Dairy Company, Inc., and same was argued, whereupon, after due consideration, the order of the Milk Control Commission dated June 8, 1948, suspending the license of the Greenville Dairy Company, Inc., is adjudged unreasonable and illegal.

The prothonotary is ordered to return the record to the Milk Control Commission, and the Milk Control Commission is directed to revoke the aforementioned order.